**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Donia Sawwan, Esq. (DS/9338)
75 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: (973) 992-4800
Facsimile: (973) 992-9125
*dsawwan@foxrothschild.com*

Attorneys for Defendants
Eugene J. Callaghan, John Gloistein,
and E & J Agency, Inc.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROWNSTONE AGENCY, INC. and MURPHY & JORDAN, <br><br> Plaintiff, <br><br> vs. <br><br> EUGENE J. CALLAGHAN, JOHN GLOISTEIN, E & J AGENCY, INC. <br><br> Defendants. | Civil Action No. 1:08-cv-542 <br><br> **AFFIDAVIT OF JOHN GLOISTEIN** |

STATE OF NEW JERSEY )
                         ) ss:
COUNTY OF ESSEX )

       JOHN GLOISTEIN, being duly sworn, deposes and says:

       1.    I am the sole shareholder of J.A. Insurance Consultants, Inc.

       2.    J.A. Insurance Consultants, Inc., (hereinafter referred to as "J.A. Insurance") is a Florida Corporation with its principal place of business located at 110 Phyllis Drive, Old Tappan, N.J.

3. In or about 1992, J.A. Insurance entered into an independent contractor agreement whereby it would broker insurance for its clients through Murphy & Jordan, Inc. in exchange for commissions.

4. It was agreed among the parties that all accounts brokered by J.A. Insurance through plaintiff would remain clients of J.A. Insurance and of mine (hereinafter referred to as "Proprietary Accounts").

5. In approximately 2000, Murphy & Jordan, Inc. dissolved and Plaintiff Murphy & Jordan (hereinafter referred to as "M&J") was formed.

6. At that time, M&J agreed that J.A. Insurance would continue to broker insurance for my Proprietary Accounts through Plaintiff M&J in exchange for commissions, which were paid by Plaintiff Brownstone.

7. In or about 2004, it became clear that Plaintiff M&J was having difficulty appropriately servicing my Proprietary Accounts as to insurance coverage which was purchased by said Accounts.

8. As a result, it was agreed between J.A. Insurance, myself and Plaintiff Brownstone that I would become employed by Brownstone as an employee solely for purposes of servicing my Proprietary Accounts as well as certain House Accounts of Plaintiffs as agreed upon by the parties.

9. It was agreed and understood that my employment with Brownstone would not alter the parties' agreement as to my Proprietary Accounts, and that all accounts brokered by J.A. Insurance would remain the property of J.A. Insurance and myself.

10. After I became employed by Brownstone, Plaintiff Brownstone continued to pay commissions as to my Proprietary Accounts to J.A. Insurance.

2

RL1 692963v1 02/05/08

11. J.A. Insurance was issued a 1099 form by Plaintiff Brownstone as to all such commission payments. A true and correct copy of the 2007 1099 issued to J. A. Insurance Consultants is annexed hereto as Exhibit A.

12. I never entered into any non-competition agreement or other restrictive covenant with Plaintiffs.

13. I have over ___37___ years of experience in the insurance business.

14. Insurance brokerage is not an exclusive business.

15. Clients are free to consult with more than one broker at any one time. Indeed, customers often utilize multiple insurance brokers to either get more competitive quotes and/or obtain a quote from a certain insurance company who does not have a relationship with their current broker.

16. Information regarding accounts, rates, and customer names and addresses is readily available in the industry.

17. In fact, all parties agreed and understood that J.A. Insurance and I were free, either separately and/or in combination with others, to establish and/or continue a business based upon my Proprietary Accounts.

18. At no time did anyone from Plaintiffs indicate they believed that any information was confidential nor did anyone ever request that I enter into any type of confidentiality or non-competition agreement.

19. At all times it was agreed and understood that should I wish to do so I could establish another business. In that case, I would continue to work during a mutually agreed upon transition period, and that during such transition period, the parties would provide for the

transition of House Accounts to other employees and/or agents of Plaintiffs as designated by Plaintiffs.

20. On or about October 17, 2007, Mr. Callaghan and I met with Gene Murphy at Harry Hanover's Square Restaurant for lunch.

21. Mr. Callaghan advised Mr. Murphy that he had liked working at Brownstone but that he could no longer tolerate Mr. Cassara's constant abuse.

22. Mr. Callaghan reminded Mr. Murphy that one of his Proprietary Accounts, Chopper Logistics (hereinafter referred to as "Chopper") had repeatedly offered Mr. Callaghan a position with Chopper, and that as a result of retaliatory/harassing conduct by Mr. Cassara, Mr. Callaghan was considering accepting a Chopper offer and opening his own business.

23. Around this time, Mr. Callaghan and I decided to form our own insurance brokerage agency and E & J Agency, Inc. was incorporated in the State of New Jersey.

24. Mr. Callaghan and I then applied to the State licensing board for E & J Agency, Inc. to become a licensed insurance broker in the State of New Jersey.

25. However, no further steps were taken and none of our Proprietary Accounts was notified before we gave notice of our resignation to Plaintiffs.

26. On or about December 19, 2007, I drafted a resignation letter and gave a copy to Mr. Callaghan for his review. However, that letter was never finalized or given to Plaintiffs.

27. On December 28, 2007, Mr. Callaghan gave his notice to Plaintiffs. I also intended to give my notice on that date and then help transition my House Accounts to other employees of Plaintiffs.

28. Before I could formally give my notice of resignation, Brad Brown (the second largest stockholder of Brownstone) came to speak with me about Mr. Callaghan's resignation.

4

Mr. Brown asked me if I would like to take over Mr. Callaghan's House Accounts and other responsibilities or if I was leaving with Mr. Callaghan.

29.    I informed Mr. Brown that I was leaving with Mr. Callaghan and that we were starting our own business. Mr. Brown replied, "I guess Gene is serious this time."

30.    Following our meeting, Mr. Brown made a telephone call to someone and advised them that I was resigning.

31.    On December 31, 2007, I arrived at work as scheduled. I had full access to my computer system (no passwords had been changed) and continued to work as usual.

32.    I was also in the office working on January 2nd -5th. At no time did anyone from Plaintiffs discuss with me my resignation or attempt to prohibit me from continuing to work on my Proprietary Accounts or House Accounts.

33.    On January 7th and 8th, I was traveling in Florida. On January 7, 2008, I received a telephone call from Gene Callaghan and was told that I needed to clear out my desk immediately upon my return.

34.    I came into Brownstone's office on January 9, 2008 as directed and cleaned out my desk. There was no employee from Brownstone to witness or to advise me regarding the termination.

35.    I did not contact my Proprietary Accounts to notify them of my new business adventure until after I gave notice of my resignation on December 28, 2007.

36.    I have never contacted any of my House Accounts to try to solicit their business for E & J Agency, Inc.

5

RL1 692963v1 02/05/08

37. Since resigning, I have contacted my Proprietary Accounts to notify them of my new business venture. These accounts are the accounts that J.A. Insurance brought to Plaintiffs and were always understood to be my Proprietary Accounts.

38. Most of my Proprietary Accounts are located in the State of Florida. To my knowledge, there is no employee of Plaintiffs licensed in the State of Florida to broker/produce insurance. Accordingly, once I resigned, Plaintiffs could no longer service these clients and/or broker/produce insurance for them.

_____
John Gloistein

Dated: February 5, 2008

Sworn to and subscribed
Before me this 5th day of
February 2008.

_____
Ronny C. Gonzales
Notary Public
Attorney At Law
State of New Jersey

**EXHIBIT A**

FORM # LMISCREC

| | | |
|---|---|---|
| PAYER'S name, street address, city, state, ZIP code, and telephone no.<br>Brownstone Agency Inc.<br>32 OLD SLIP<br>8TH FLOOR<br>NEW YORK, NY 10005-3504 | ☐ CORRECTED (if checked)<br>1 Rents<br>$<br>2 Royalties<br>$<br>3 Other income<br>$ | OMB No. 1545-0115<br>2007<br>Form 1099-MISC<br>4 Federal income tax withheld<br>$ | Miscellaneous Income<br>Copy B<br>For Recipient |
| PAYER'S federal identification number<br>13-2766983 | RECIPIENT'S identification number<br>65-0335828 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | |
| RECIPIENT'S name, street address (including apt. no.), city, state, and ZIP code<br>J A Insurance Consultants<br>110 Phyllis Drive<br>Old Tappan, NJ 07675 | | 7 Nonemployee compensation<br>$ 147641.31 | 8 Substitute payments in lieu of dividends or interest<br>$ | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| | | 11 | 12 | |
| Account number (see Instructions)<br>JG | | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$ | 17 State/Payer's state no. | 18 State income<br>$ |

Form 1099-MISC    (keep for your records)    Department of the Treasury - Internal Revenue Service